**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

D'ANDRE HARRIS,

Plaintiff,

v.

GENERAL MOTORS, LLC,

Defendant.

CASE NO. 1:24-CV-497-HAB

**<u>OPINION AND ORDER</u>**

Plaintiff D'Andre Harris ("Harris") filed his initial Complaint in this case against Defendant General Motors, LLC ("General Motors") on November 21, 2024, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended ("Title VII"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), and 42 U.S.C. § 1981, as amended. (ECF No. 1). On July 3, 2025, the Court granted in part and denied in part a motion for judgment on the pleadings filed by General Motors, dismissing Harris's Title VII claim, to the extent based on ancestry or national origin, with prejudice, and dismissing Harris's Title VI claim without prejudice, granting Harris leave to replead his Title VI claim. (ECF No. 36). Harris filed his amended complaint on July 14, 2025 (ECF No. 39). The Court denied General Motors' renewed motion to dismiss the Title VI claim. (ECF No. 50).

On December 22, 2025, General Motors filed a Motion for Summary Judgment (ECF No. 46). That motion is now fully briefed and ripe for consideration. (ECF Nos. 46-47, 51-53, 56-57, 61). For the reasons stated below, the Court grants the Motion for Summary Judgment as to all claims.

## I. FACTUAL BACKGROUND

In May 2013, General Motors hired Harris, an African-American male, as a production line worker. (Def. SOMF ⁋ 1 (ECF No. 47); Pl. SOMF ⁋⁋ 38-39 (ECF No. 51)). Harris held several positions at General Motors and was eventually promoted to Chassis/Final Business Manager at the Fort Wayne Assembly Plant in 2022. (Pl. SOMF. ⁋ 2). In his capacity as Business Manager, Harris "oversaw" employees on the final line and "was available to these employees and their supervisors if they had questions." (*Id.* ⁋ 4).

One of the temporary contract assembly workers on the line at that time was named April Camos. (*Id.* ⁋ 6). Harris worked above Camos, though the exact nature of their workplace relationship is disputed, and he interacted with her weekly.[1] (*Id.* ⁋⁋ 6-7). He had her personal cell phone number. (*Id.* ⁋ 7). Camos also had Harris's home address, which he admitted he provided to her because she was "going through some things" and asked if she could come over to talk to Harris. (Def. SOMF ⁋ 8). In July 2023, Camos visited Harris's home. (*Id.* ⁋ 9).

On October 3, 2023, Camos was discharged after she failed to report to work the day before—a third strike. (Camos Notice of Corrective Action at 2 (ECF No. 46-3)). Also on October 3, 2023, Camos submitted a complaint to General Motors' Human Resources Department, claiming that Harris sexually harassed her on the assembly line in front of other employees while she was working at the Fort Wayne Assembly Plant. (Camos Written Compl. (ECF No. 46-3)). She also alleged that Harris kept trying" to get [her] to sleep with him," telling her he would "help [her] out whenever [she] needed it" if she agreed. (*Id.*)

[1] General Motors contends that Harris "supervised" Camos. (Def. SOMF ⁋ 6). Harris "clarifies that he has more responsibility than group leaders and assembly workers, however, [he] did not directly supervise Camos. (Pl. SOMF ⁋ 7). Rather, the shift leader was in charge of the group leaders who supervised assembly workers." (*Id.*). The Court finds that this dispute is not material.

Camos's complaint was referred to General Motors's internal investigations unit, where it was investigated by Kelli Brock ("Brock"). (Def. SOMF ⁋⁋ 11-12); (Investigation Rep. (ECF No. 46-4)). During the investigation, Brock interviewed Harris, Camos, and witnesses including Robert Carpenter and Damikco Stockard, other General Motors employees. (Investigation Rep. at 2). Brock documented her findings in her report. (*Id.* at 3-4). Ultimately, the report concluded that the allegation that Harris "continuously asked [Camos] out for dates and made sexual comments about her" was "substantiated" by the investigation. It found the allegation that Harris "convinced [Camos] to have sex with him when he promised her he would 'help her out whenever she needed it' if the two had sex and has continued to request sex" was "unsubstantiated." (*Id*. at 1, 4). The report stated that the substantiated allegation constituted sexual harassment such that it violated General Motors policy. (*Id.* at 1).

On February 1, 2024, Harris and his boss, Billy Pagan, met with Brittany Shady, who worked in the General Motors HR department. (Def. SOMF ¶ 30). Harris testified that Shady told Harris he had violated the "Code of Conduct" and that his position had been terminated. (Harris Dep. at 64:1-17 (ECF No. 46-2)). When he asked Shady exactly which code of conduct provision he had violated, he reports that she said she did not know but that it stemmed from the investigation into Camos's accusations. (*Id.* at 64:22-25; 65:1-17). When Harris was leaving the termination meeting, Shady gave him a letter regarding the "open door" policy, through which he could appeal his termination. (*Id.* at 66:6-9). Harris then submitted a request for his termination to be reviewed, claiming he was terminated due to false allegations of sexual harassment. (*Id.* at 67:13-23).

General Motors opened an investigation into Harris's complaint. (Open Door Rep. (ECF No. 46-4)). The complaint was investigated by Craig Kotulock, an Employee Relations Investigator. (*Id.*) He reviewed case information, reviewed the investigation process with Brock, and interviewed both Harris and Shady. (*Id.*) Ultimately, Kotulock determined that Harris's complaint was "unsubstantiated." (*Id.*). On February 12, 2024, the Director of Policy and Employee Relations Investigations sent Harris a letter stating that it had concluded that his claim was unsupported, as "GM's policies and procedures were applied appropriately, and . . . management acted properly." (Final Determination Letter (ECF No. 46-5)).

Subsequently, as required for a discrimination claim under Title VII, Harris took his grievances before the Equal Employment Opportunity Commission, alleging "discrimination based on race." (EEOC Charge (ECF No. 53-1)). Once Harris "received his Dismissal and Notice of Rights[,]" he sued General Motors in this forum. (First Am. Compl. ¶ 10 (ECF No. 39)).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue

is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## III. DISCUSSION

Harris brings race discrimination claims pursuant to 42 U.S.C.§ 1981, Title VII, and Title VI. General Motors moves for summary judgment in its favor as to all three claims. The analysis of a Title VII claim and a Section 1981 claim are the same, and cases discussing claims under either provision are instructive. *See Johnson v. Gen. Bd. Of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013). Because this Court's analysis applies with equal force under both provisions, the Court will address the Title VII claim and Section 1981 claim as one before turning to the Title VI Claim.

### A. Discrimination

Title VII forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination claims may be reviewed on summary judgment under the direct or the burden-shifting methodologies. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). When a plaintiff responds to a motion for summary judgment on an intentional

discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), a court should assess the case in those terms. *Id.* However the plaintiff chooses to proceed at the summary judgment stage, the Court must consider all the evidence together to determine whether a reasonable jury could "conclude that the plaintiff's race . . . caused the discharge." *See Ortiz v. Werner Enters., Inc.*, 834 F.3d. 760, 765 (7th Cir. 2016).

Under the burden-shifting approach, which Harris follows in his response brief, a plaintiff must come forward with evidence that (1) he is a member of a protected class, (2) he was meeting his employer's legitimate performance expectations, (3) he suffered an adverse employment action, and (4) other similarly-situated employees who were not members of the protected class were treated more favorably. *See Burks v. Wis. Dep't of Tansp.*, 464 F.3d 744, 750-51 (7th Cir. 2006). If Harris establishes a prima facie case, the burden shifts to General Motors to offer a permissible, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to Harris, who must then submit evidence that General Motors' purported explanation is pretextual. *McDonnell Douglas*, 411 U.S. at 802, 804.

**1. Prima Facie Case**

Harris's status as a member of a protected class is undisputed, as is the fact that he suffered an adverse employment action. General Motors argues that Harris cannot establish the final factor—that a similarly-situated employee outside of the protected race class was treated more favorably.

"Employees are similarly situated if they are directly comparable in all material respects." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). While the requirements for finding a comparator to be similarly situated are not onerous, there must be enough of a

commonality "to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007). "When uneven discipline is the basis for a claim of discrimination, the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor." *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011).

Harris offers three comparators: Darcy Gaff ("Gaff"), Frank Bush ("Bush"), and Brandi Crouse ("Crouse"). All three are white. (Harris Dep. at 72:6-12). The first comparator, Gaff, failed to comply with a safety policy when she "signed off that a driver side seat was bolted down [and] safely secured to the truck" when that was not actually the case. (*Id.* at 72:18-24). Although this was a "safety-critical" violation that would normally result in termination, Harris testified that "she was basically took into the office, sat down, talked to, and suspended for half the day." (*Id.* at 73:4-8, 17-25). Harris was aware of the incident because he was "the business manager at the time, and she was one of the supervisors on [his] shift." (*Id.* at 73:9-10).

Bush "got into a verbal altercation with one of the hourly employees" during which he "cursed [the hourly employee] out." (*Id.* at 74:3-4). As a result, Bush was "taken up to HR, talked to, got a write-up and sent back to do his job." (*Id.* at 74:4-7). Harris was aware of this incident because he observed it—Bush was "the maintenance guy on the shift [Harris] was on." (*Id.* at 74:8-13). Regarding whether the discipline Bush received was typical, Harris testified that he did not know other people who had engaged in verbal altercations and received solely a write-up, and that he has "known people to get fired for those offenses, especially when it's the salary [employees] cursing at the hourly." (*Id.* at 74:14-22).

With respect to the third comparator, Harris testified that Crouse "was showing some stuff in her phone to another person, and the person walking by happened to see the naked photos of

somebody" and reported the incident to HR. (*Id.* at 75:6-9). As a result, Crouse was "taken up to HR . . .[,] given a letter to her file . . . [, and] sent on back to doing her job." (*Id.* at 75:10-11).

The Court finds that none of these comparators are sufficiently "similarly situated" to satisfy the fourth component of the *McDonnell Douglas* test. In this case, the three proffered comparators did not have the same job titles and are unlikely to have had the same supervisors. And most critically, Harris has provided no evidence to indicate that an individual outside of the protected class engaged in "conduct of comparable seriousness." *See Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012) (finding that the "critical question" when determining whether comparators are engaged in similar misconduct is "whether they have engaged in conduct of comparable seriousness."). Gaff engaged in a safety violation, Bush used profanity when speaking to another employee, and Crouse showed an offensive photograph on work grounds. Harris testified that he was unaware of any of the three of them having been involved in a sexual harassment investigation. (Harris Dep. at 73:14-16; 74:24-25; 75:1, 17-19). Jodi West, HRLR Director[2] at the General Motors Fort Wayne Assembly Plant, confirmed in a declaration that none of the three comparators "were cited for violating [General Motors'] policy regarding Discrimination and Harassment." (West Decl. at 2 (ECF No. 46-6)).

In an attempt to bolster his case, Harris testified that Don Davis ("Davis"), another African-American employee, "let a safety critical get out of the lot, and he signed off it was bought off"—so, a similar transgression to Gaff. (*Id.* at 75:22-25; 76:1-3). Unlike Gaff, however, "when they found out it was him, he was terminated." (*Id.* at 76:2-3). The Court finds this unpersuasive. In

---

[2] General Motors does not define "HRLR" but, according to General Motors' Careers website, the acronym stands for Human Resources and Labor Relations. *See* General Motors, "HRLR Site Lead – Warehousing*,"* *available at* https://search-careers.gm.com/en/jobs/jr-202619637/hrlr-site-lead-warehousing/ (last accessed Sept. 10, 2026).

order to satisfy the "similarly-situated" component of the *McDonnell Douglas* prima facie case, Harris must provide comparator that are similarly situated to *himself*, not to other General Motors employees in his protected class.

Harris has failed to present evidence of any similarly-situated, non-African-American employee who was treated more favorably. For this reason alone, his discrimination claims fail under the *McDonnell Douglas* framework.

**2. Legitimate, Non-Discriminatory Reason and Pretext**

Further, even if the Court were to find that Harris had met his *prima facie* burden, summary judgment would still be appropriate. General Motors has articulated a legitimate, non-discriminatory reason for terminating Harris's employment and he has failed to demonstrate that that reason was pretextual.

It is undisputed that Camos made a complaint about Harris. (Pl. SOMF ¶ 10). The record is clear that General Motors investigated that complaint, including by interviewing multiple witnesses. *See* Investigation Rep. That report concluded that Harris had committed sexual harassment and thereby violated General Motors Policy. (*Id.*) For that reason, he was terminated. (Open Door Rep. at 2). He initiated an "open door" appeal, which opened a new investigation, which reached the conclusion that his termination was legitimate. (Open Door Determination (ECF No. 46-5)). The Court finds, therefore, that General Motors has demonstrated that it had a legitimate, non-discriminatory reason for terminating Harris's employment.

Harris argues that General Motors' reason for terminating him was pretextual. In order to demonstrate pretext, a plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [a defendant's] proffered reasons that a reasonable person could find them

unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).

As evidence of pretext, Harris first points to the fact that the investigation report found Camos's "quid pro quo sex-for-help/continued sex-demand" allegation to be unsubstantiated. (ECF No. 52 at 11-12). He argues that "[a] reasonable jury could infer that terminating Plaintiff as if the most severe allegation were established—especially where comparator evidence shows lesser discipline for serious violations—supports a pretext inference." (*Id.* at 12). But the record does not support the proposition that General Motors "terminat[ed] [Harris] as if the most severe allegation were established"—the initial investigation report is clear that only one of the allegations was substantiated and the "open door" investigation report is clear that the initial report's findings were the reason for termination. Further, as explained above, the Court does not credit the "comparator evidence" Harris has provided.

Similarly, Harris points to "[t]iming evidence suggesting motive disputes." (*Id.*) By this, he means the fact that Camos filed her complaint on the same day she was discharged for failure to report to work. But the veracity of the allegations against Harris is beside the point. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). Harris has not explained how the timing of Camos's complaint in relation to her discharge would implicate the honesty of General Motors's stated reason, as opposed to simply the veracity of Camos's allegations—particularly considering that General Motors investigated the allegations and prepared a report that concluded that the allegations were partially substantiated, a process which was then subject to a separate investigation and report.

Harris also makes procedural arguments. He first cites "[e]xplanation gaps at termination and decisionmaker opacity, pointing to Shady's statements during his termination meeting—that she did not know what code provision Harris had violated and that she did not know who made the decision—and argues that, "[i]n the Seventh Circuit, such inconsistencies and opacities can be probative where they permit an inference that the stated reason is a cover for discrimination." (ECF 52 at 12). In the same vein, Harris argues that neither the initial investigation nor the "open door" investigation were procedurally fair. (*Id.*) He contends that he was not afforded the opportunity to defend himself because he "did not know what content the . . . Investigators had in their possession." (*Id.*).

The Court finds both of these arguments unpersuasive. Ultimately, Harris has failed to demonstrate pretext because he has failed to provide any indication of racial motive. Even if the Court were to agree that Harris has raised questions regarding General Motors' reasons for terminating Harris were pretextual, "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013); *see also Martin v. Ill. Dep't of Human Servs.*, 2026 WL 837025, *7 (granting summary judgment in favor of defendant on a race discrimination claim and explaining that "[w]hile the Court agrees that the record is fuzzy on the exact factors that prompted [an adverse employment action], [plaintiff] has not pointed to suspicious circumstances to suggest that the true reason for the [adverse action] was her race.").

Harris provides the Court with no evidence at all that General Motors' decisions were motivated by "prohibited animus." In his deposition, Harris admitted that no one made any racially discriminatory comments toward him while he was working at General Motors. (Harris Dep. at 78:4-6). While Harris testified that Nathan Ogg, a Human Resources director, did not like him—

something he discovered through rumors—, Harris acknowledged that he had not heard any rumors that Ogg had ever made comments about Harris's race. (*Id.* at 79:3-15). And while he offers the comparison between how General Motors disciplined Crouse and Davis for similar offenses, the Court finds that anecdote to be insufficient to make up for the fact that Harris has provided no evidence of a connection between his race and General Motors's decision to terminate him personally.

Ultimately, "[t]o defeat a motion for summary judgment on the merits of a title VII race-discrimination claim, a plaintiff must produce evidence that would let a reasonable factfinder find that [his] race caused an adverse employment action." *Paterakos v. City of Chicago*, 147 F.4th 787, 795 (7th Cir. 2025) (citing *Ortiz*, 834 F.3d at 765 (7th Cir. 2016)). On this record, no reasonable jury could find that General Motors' decision to terminate Harris was pretext for racial discrimination. Thus, the Court grants summary judgment in favor of General Motors on Harris's discrimination claims.[3]

**B. Title VI**

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In *Ahern v. Board of Education of City of Chicago*, the Seventh Circuit clarified that Title VI employment discrimination claims are limited to cases where "(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes

[3] Because "[t]he legal analysis for discrimination claims under Title VII and § 1981 is largely identical," *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022), the Court need not analyze Harris's § 1981 claim separately.

discrimination against the primary beneficiaries of the federal aid." 133 F.3d 975, 978 (7th Cir. 1998).

In its February 11, 2026 Opinion and Order denying General Motors' motion to dismiss, the Court found that Harris had sufficiently alleged that the primary objective of the federal aid General Motors received was to provide employment. *See* ECF No. 50. Now, General Motors argues that the Court should grant summary judgment in its favor on Harris's Title VI claim because he has provided no evidence to support that allegation. (ECF No. 57 at 1-2). The Court agrees.

General Motors contends that Harris has conducted no depositions or discovery regarding his Title VI claim. (*Id.*). Harris does not dispute this statement. Rather, he takes issue with the evidence General Motors provided regarding his Title VI claim—in the form of a declaration from Darryl Herron, a General Motors Plant Finance Manager, attached to General Motors' reply brief. (ECF No. 56-1). Herron testified that while General Motors "receives federal funding in the form of grants from various government agencies," "D'andre Harris did not work on any projects at the Fort Wayne Assembly plant in 2022, 2023, or 2024 that would have received any type of federal funding" and his salary in those years was not paid with any federal funding. (Herron Decl. ¶¶ 6-8).

Harris argues that the declaration does not resolve his Title VI claim. First, he contends that declaration is too general—it does not identify specific funding or its primary objective (including whether it was intended to support employment), and it relies on "unspecific corporate records without identifying what records were reviewed or providing supporting documentation." (ECF No. 62 at 2-3). This argument misunderstands the parties' burdens with respect to this claim at the summary judgment stage. "A moving party can obtain summary judgment by simply

pointing the court to the total absence of evidence supporting one element of a non-movant's claim, if the non-movant will bear the burden of proof on that claim at trial." *Liberty Surplus Ins. Corp. v. City of Vandalia,* 2018 WL 2745896, at *5 (C.D. Ill. June 7, 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). This is what General Motors has done here—pointed to the total lack of evidence Harris has put forth with respect to an element of his Title VI claim in support of its motion for summary judgment. General Motors cannot be held responsible for proving the element's negative—that the primary purpose of the federal funding General Motors receives is *not* to provide employment. *See Cole v. Janssen Pharm., Inc.*, 2017 WL 6372777, at *3 (E.D. Wis. Dec. 12, 2017) ("There is no requirement that a moving party who does not bear the burden of proof establish that the element does not exist. In other words, a moving party who does not have the burden of proof at trial, (usually the defendant), is not required to prove a negative in order to make a prima facie showing for summary judgment."). Attacking General Motors's affidavit does not absolve Harris of his responsibility to prove his claim.

Harris appears to concede a lack of evidence regarding General Motors's federal funding in a bizarre paragraph of his response brief, which reads:

> To the extent Defendant argues Plaintiff lacks evidence of federal assistance of primary objective, the current packet of exhibits supplied for this draft does not include grant/loan documents, agency award letters, discovery admissions, or other funding records. Those facts are therefore unspecified here. If such evidence exists in discovery, Plaintiff can and should designate it. If it does not exist in Plaintiff's possession and remains uniquely in Defendant's control, Rule 56(d) provides a mechanism to defer or deny summary judgment to permit the nonmovant to obtain essential facts by affidavit/declaration.

(ECF No. 52 at 8). The Court notes that this reads more like instructions *to* Harris and his counsel than a submission *from* Harris and his counsel to the Court—but regardless of how it ended up in the brief, it only serves to emphasize Harris's failure to put forth the evidence he needs to support his claim.

Perhaps in response to this strange instruction included in the response brief, in his sur-reply, Harris argues that "the declaration underscores that evidence regarding federal funding and its objectives is uniquely within Defendant's control. To the extent additional evidence is required, denial or deferral under Rule 56(d) is appropriate." (*Id.* at 3). Rule 56(d) provides that, "if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order."

Fed. R. Civ. P. 56(d). However, "[a] party seeking relief under Rule 56(d) must show by affidavit or declaration specific reasons discovery should be extended, which requires more than a fond hope that more fishing might net some good evidence." *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 864 (7th Cir. 2019). As noted above, Harris does not dispute his failure to take discovery into the primary purpose of any federal funding received by General Motors He provides no explanation—let alone "specified reasons"—for his failure to do so, and does not provide the "affidavit or declaration" required by the rule. While he contends that the evidence regarding funding is "uniquely within Defendant's control," he provides no explanation for why that would be the case. Because the requirements of the rule are not satisfied—and Harris has not given any indication that his request is not solely motivated by "a fond hope that more fishing might night some good evidence" "—the Court will not defer ruling on this claim pursuant to Rule 56(d). *See Kallal v. CIBA Vison Corp.*, 779 F.3d 443, 446-47 (7th Cir. 2015) (affirming denial of 56(d) request for additional discovery where party did not submit affidavit as required).

In his sur-reply, Harris also makes a substantive argument regarding the contents of the Herron declaration—that General Motors' assertion that Harris did not work on federally-funded projects "improperly narrows the Title VI inquiry to Plaintiff's specific job duties and work location," arguing that the "program or activity" receiving federal assistance "is defined broadly and is not limited to a particular facility, project, or employee's assigned duties." (ECF No. 61 at 3). The Court need not reach this question because it is undisputed that Harris is required to demonstrate that the primary purpose of the funding is to provide employment—a requirement he has not met.[4]

Finally, Harris notes the merits overlap between his claims under Titles VI and VII. "The framework for establishing discrimination under Title VI is similar to the method used for Title VII; under Title VI, a plaintiff may prove discrimination by presenting either direct or indirect evidence of discriminatory intent." *Brewer v. Bd. of Trs. Of the Univ. of Ill.*, 407 F. Supp.2d 946, 970-71(C.D. Ill. 2005). Harris states that "if a jury could find that race caused Defendant to terminate Plaintiff while treating comparable non-Black employees more favorably, that same finding would support intentional discrimination under Title VI." (ECF No. 52 at 8). As explained above, the Court finds that Harris has not produced evidence that would support a finding of racial discrimination under Title VII—that finding only has negative implications for the question of whether a jury could find intentional discrimination under Title VI. While General Motors did not raise this merits argument in seeking summary judgment on Harris's Title VI claim, because the

[4] The Seventh Circuit has indicated that the question of the exact scope of Title VI might be an open question, in light of the Seventh Circuit's interpretation of the Civil Rights Restoration Act, 42 U.S.C. § 2000d-4a, in *T.S. ex rel. T.M.S. v. Heart of CarDon., LLC*, 43 F.4th 737 (7th Cir. 2022). *See Collins v. Ctrs. for Medicare and Medicaid Servs.*, 2025 WL 599630, at *2-3 (7th Cir. Feb. 25, 2025). However, the parties did not address or otherwise make any argument related to this line of cases.

discrimination element was fully briefed and discussed in the Title VII context, the Court alternatively *sua sponte* grants summary judgment on Harris's Title VI claim on this basis as well.

**C. CONCLUSION**

For the above-stated reasons, the Court GRANTS General Motors' motion for summary judgment (ECF No. 46) in its entirety.

**SO ORDERED** September 10, 2026.

s/Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT